AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
Aug 12 2026
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

United States of America
v.
John Macias

*Defendant(s)*

Case No. CR 26-71059-MAG

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of 12/8/25,12/18/25,1/8/26, 7/30/26 in the county of Santa Clara in the Northern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A) | conspiracy to distribute methamphetamine; distribution of methamphetamine; |

This criminal complaint is based on these facts:

Please see the affidavit of ATF Special Agent Rosalia Reyes

☑ Continued on the attached sheet.

/s/ Rosalia Reyes/SvK w/permission
*Complainant's signature*

Rosalia Reyes, ATF Special Agent
*Printed name and title*

Sworn to before me by telephone.

Date: 08/12/2026

Susan van Keulen
*Judge's signature*

City and state: San Jose, California

Susan van Keulen, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Rosalia Reyes, being duly sworn as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application for an arrest warrant and criminal complaint alleging violation of 21 U.S.C. §§ 846 (drug trafficking conspiracy) and 841(a)(1) & (b)(1)(A) (Distribution of a Controlled Substance) by John MACIAS and Ernie Limes GUTIERREZ on July 30, 2026 (Count One).

**AFFIANT BACKGROUND**

2. I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since January 2024. I am a graduate of the Criminal Investigator Training Program and the ATF Special Agent Basic Academy at the Federal Law Enforcement Training Center in Glynco, Georgia.

3. There, I received training in the investigation of illicit firearms possession, firearms trafficking, the distribution of controlled substances, and arson, and explosives. I participated in dozens of investigations involving the illegal sales, transfer, and possession of firearms and controlled substances and interviewed defendants, informants, and witnesses with first-hand knowledge of methods for trafficking the same (e.g. coded language). Additionally, I have participated in many other aspects of federal criminal investigations, including conducting surveillance and the use of confidential informants and undercover agents to make controlled purchases of controlled substances and/or firearms. I have executed and participated in the execution of various federal warrants, including arrest warrants.

4. Prior to my tenure as a Special Agent, I worked as a Police Officer for the Department of Veteran Affairs between 2022 and 2023. I also worked for the Department of Defense as a Civilian Police Officer between 2019 and 2022, and assisted with Counter Terrorism measures routinely at The Naval Postgraduate School in Monterey, CA.

I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses enumerated in 18 U.S.C. § 3051, including Title 18, Title 21, and Title 26 violations.

5. The facts set forth in this Affidavit are based on my own personal knowledge; my review of reports, surveillance videos, photographs, and other records related to this investigation; information obtained from law enforcement agents, investigators, or other individuals with knowledge of this investigation; and information gained through my training and experience. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of arrest warrants, it does not set forth each and every fact that I, or

others, have learned during the course of this investigation. Unless otherwise noted, where this Affidavit describes information learned from other sources, such information is recounted in sum and substance.

9. ATF utilized a confidential informant (CI)[1] in this case. Prior to every controlled meeting involving the CI, law enforcement searched the CI's person and vehicle for contraband. At no time did law enforcement find contraband in CI's vehicle or on his/her person. As described below, ATF provided the CI with ATF funds to purchase narcotics and firearms. Law enforcement also equipped the CI with an audio/video recorder and audio transmitting device, such that these controlled meetings were audio/video recorded and monitored by agents in real time.

**SUMMARY OF PROBABLE CAUSE**

**December 8, 2025, controlled methamphetamine buy involving MACIAS and GUTIERREZ**

10. On December 8, 2025, ATF utilized the CI to conduct a controlled purchase of narcotics. At approximately 6:10 p.m., the CI arrived at the intersection of Southside Drive and Senter Road, San Jose, CA.

11. The CI approached a nearby residence ("Residence-1") and started a conversation with an individual who was working on his car.[2] The CI and individual talked about various things but eventually discussed purchasing methamphetamine. The individual told the CI that he could obtain methamphetamine, and it would take approximately two hours. The CI gave the individual his phone number.

12. The CI then left the area and waited. At approximately 7:07 p.m., the same individual from outside Residence-1 (identified by his voice and contextual clues) called the CI and told the CI that he had the narcotics.

13. The CI drove back to a parking lot in the same area as Residence-1. When he got there, another individual, later identified as John MACIAS[3], walked to the driver's side window of the CI's vehicle and motioned him to park in a particular parking stall. During this time, law

---

[1] The CI is cooperating with federal law enforcement agents in exchange for a possible sentencing consideration in an ongoing federal case involving robbery. The CI has not yet been sentenced. The CI also has prior arrests and/or convictions for obstruction of a public officer, and theft, drug and firearm violations.

[2] The CI did not previously know who this person was.

[3] Law enforcement identified John Macias by his California driver's license photo. The person in the photograph appeared to be the same person law enforcement saw engaging with the CI on December 8, 2025, December 18, 2025, January 8, 2026, May 14, 2026, and July 30, 2026.

enforcement saw a male driver, wearing a bright yellow construction jacket, arrive to the location in a silver Ford truck. The driver was later identified as Ernie Limes GUTIERREZ.[4]

14. The CI gave MACIAS money. MACIAS walked to the driver's side of the silver truck, and then walked back to the CI's vehicle, and handed the CI a plastic bag.

15. The suspected narcotics were sent to the DEA Western lab for analysis. The DEA Western lab report concluded that the narcotics purchased on December 8, 2025, were in fact methamphetamine with the approximate net weight of 56 grams and approximate purity of 100%.

**December 18, 2025, controlled methamphetamine buy involving MACIAS and GUTIERREZ**

16. On December 18, 2025, at approximately 6:10 p.m., the CI went to the intersection of Southside Drive and Senter Rd in San Jose, CA.

17. At approximately 6:35 p.m., the CI approached Residence-1's front lawn and encountered an individual who was waiting to speak to MACIAS. The CI asked if the individual could call MACIAS so that the CI could talk to him. The individual walked towards the front door of Residence-1 and called out to MACIAS utilizing his first name "John." The individual returned to where the CI was standing on the sidewalk and stated MACIAS was coming down from upstairs. A woman also came to the door and told the CI that MACIAS just woke up and would be down in twenty minutes.

18. Soon after, MACIAS exited Residence-1 and met the CI on the sidewalk in front of Residence-1. The CI and MACIAS discussed purchasing methamphetamine. MACIAS said that he would be able to get the CI methamphetamine and would have it delivered. MACIAS told the CI that he would make a phone call (presumably to his supplier). The CI and MACIAS then walked to the CI's vehicle and they both got in.

19. At 8:40 p.m., law enforcement saw the same silver Ford truck registered to GUTIERREZ arrive in the area. When the truck arrived, MACIAS took money from the CI, walked over to the driver's side of the truck, stood by the truck briefly, and then walked back to the CI's vehicle. MACIAS then got into the CI's vehicle and gave the CI the item wrapped in plastic packaging. Inside the car, prior to handing the CI the package, MACIAS weighed the suspected methamphetamine on a scale. MACIAS stated the more the CI purchased from MACIAS, the better price the CI would get.

20. The suspected narcotics were sent to the DEA Western lab for analysis. The DEA Western lab report concluded that the narcotics purchased on December 18, 2025, were in fact

[4] The silver Ford truck was registered to Ernie Limes Gutierrez. A photograph of GUTIERREZ from his California driver's license matched the driver of the silver Ford truck.

methamphetamine with the approximate net weight of 223 grams and approximate purity of 91%.

**January 8, 2026, controlled methamphetamine buy involving MACIAS**

21. On January 8, 2026, the CI went to the area of Residence-1 and called MACIAS. MACIAS stated that he did not have narcotics in his possession but was waiting for someone to deliver the narcotics. At approximately 6:13 p.m., the CI met with MACIAS. MACIAS walked to the passenger side window of the CI's vehicle and got into the CI's vehicle. MACIAS told the CI that he would be able to get the CI methamphetamine, but that a friend would be dropping off it off.

22. At 7:04 p.m., MACIAS exited the vehicle briefly and met a male driver in a white Dodge truck. MACIAS then took money from the CI, walked to the white truck, walked back to the CI's vehicle, and got inside. MACIAS gave the CI a black plastic bag. At 7:30 p.m., law enforcement surveillance units observed MACIAS leave the CI vehicle and walk back to Residence-1.

23. The suspected narcotics were sent to the DEA Western lab for analysis. The DEA Western lab report concluded that the narcotics purchased on January 8, 2026 were in fact methamphetamine with the approximate net weight of 444.1 grams and approximate purity of 97%.

**May 14, 2026, controlled firearms and ammunition deal involving MACIAS**

24. From January 8, 2026, through March 11, 2026, MACIAS exchanged photographs with the CI of firearms for sale. On May 11, 2026, MACIAS called the CI and stated he had a "pump" for sale (based on my training and experience this is slang for a shotgun). At the direction of law enforcement, the CI told MACIAS the CI was interested in purchasing the firearm.

25. The CI asked MACIAS how much the firearm was, and MACIAS stated that he would sell it for $500. MACIAS agreed to sell the firearm on May 14, 2026, and sent a text message on May 13, 2026, confirming the sale.

26. On May 14, 2026, at approximately 6:00 p.m., MACIAS called the CI and told the CI that he had two other firearms for sale and that he was unable to acquire the shotgun. MACIAS told the CI that one firearm was a "choppa" (based on my training and experience this is slang for an AR style rifle), and the other was a pistol. MACIAS stated he was willing to sell both firearms for $2,000. Law enforcement instructed the CI to agree to the purchase of firearms.

27. MACIAS stated he was going to a friend's house to pick up the firearms and agreed to meet the CI in the location of Residnece-1 in an hour.

28. At approximately 8:08 p.m., law enforcement personnel saw MACIAS on foot approaching the CI's vehicle in the area of Residence-1. Law enforcement personnel saw

MACIAS holding a bag and walking to the passenger side of the CI's vehicle. MACIAS then entered via the front passenger door. Inside of the vehicle, MACIAS sold the CI two firearms in exchange for $2000.

29. An ATF Nexus Expert examined the two firearms and determined that they were both privately manufactured firearms (PMF), also known as "ghost guns." Both firearms contained ammunition totaling 24 rounds of ammunition. According to the ATF Nexus Expert, none of the rounds of ammunition were manufactured in the state of California.

**July 30, 2026, controlled firearms and methamphetamine buy involving MACIAS and GUTIERREZ**

30. On July 30, 2026, at approximately 6:35 p.m., the CI parked in the area and approached Residence-1. MACIAS was outside in the garage area. The CI met with MACIAS in the garage of Residence-1. MACIAS told the CI that he got a new number and gave the CI the number.

31. The CI asked MACIAS if he had firearms or methamphetamine for sale. MACIAS told the CI that he could sell the CI a shotgun and pound of methamphetamine for $1,800. The CI left the area, met with law enforcement, and returned to the area. At approximately 7:32 p.m., the CI met MACIAS in the parking lot near Residence-1. MACIAS asked the CI to drive them to "his pad" to conduct the pickup of narcotics. MACIAS contacted someone on his cell phone and stated "the homie has to go, so I'm just going to head over to your pad, I will call you when I get there." Based on my training and experience and the facts of this case, I believe that MACIAS was telling his source of supply that he (MACIAS) was headed to the source's residence and would call the source when he got there.

32. The CI and MACIAS then left the area in the CI's vehicle. MACIAS guided the CI to their destination, a second residence ("Residence-2"). Law enforcement saw the same silver Ford truck registered to GUTIERREZ parked outside Residence-2. This truck was the same truck that law enforcement saw during the December 8, 2025, and December 18, 2025, controlled buys.

33. Law enforcement had already established surveillance near Residence-2 prior to MACIAS and the CI's arrival. Law enforcement saw GUTIERREZ enter Residence-2 through the front door.

34. While parked in front of Residence-2, the CI gave MACIAS $1,400. MACIAS then entered Residence-2, and after approximately 5 minutes, MACIAS exited the residence and returned to the CI's vehicle. Inside of the CI's vehicle, MACIAS gave the CI approximately one pound of suspected methamphetamine.

35. The CI and MACIAS then returned to the area of Residence-1. MACIAS got out of the CI's vehicle and walked inside Residence-1. MACIAS returned to the CI's vehicle and sold the CI a shotgun (Remington 870 Shotgun) for $400.

37. The suspected methamphetamine was sent to the DEA Western Regional Laboratory for analysis. The approximate weight is 453 grams. The results are currently pending. Based on my training and experience and discussions with other agents, and the facts of this case. I believe that there is probable cause that the substance is methamphetamine.

38. A different law enforcement officer personally handled and viewed the suspected methamphetamine. This officer has testified in Santa Cruz County Court as a Certified Drug Recognition and Sales Expert and was recognized as an expert in court. At least one of the trials pertained to methamphetamine. According to the officer, the odor, appearance and texture was consistent with methamphetamine. Below is a photograph of the suspected methamphetamine.



**REQUEST FOR SEALING**

39. This investigation is not public knowledge and is ongoing. Disclosure of the complaints, or this affidavit, and the attachments thereto will jeopardize its progress. For example, if the subjects of this investigation were notified that this investigation exists, they might destroy evidence, warn co-conspirators, change patterns of behavior, flee, or otherwise seriously jeopardize the investigation. Accordingly, I respectfully request the Court issue an order that the complaints, the applications, this affidavit in support of the applications, and all attachments thereto, along with the order itself, be filed under seal until further order of this Court.

## CONCLUSION

40. Based on facts set forth in this Affidavit, there is probable cause to believe that John MACIAS and Ernie Limes GUTIERREZ each violated federal laws and respectfully request that this Court issue warrants for their arrests.

Respectfully submitted,

/s/ Rosalia Reyes/SvK w/permission
Rosalia N. Reyes
Special Agent
ATF

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 12th day of August 2026.

SUSAN VAN KEULEN
United States Magistrate Judge